Green, J.
delivered the opinion the court.
This bill was brought to settle the copartnership account between the complainants and the defendant, their former partner. The complainants, who were conducting a large ready-made clothing establishment in Baltimore, entered into an agreement, dated the 23d of October, 1827, with the defendant, by which he undertook to come to Nashville forthwith, and conduct a ready-made clothing establishment for them, and that, at the end of sis: months, he might elect to become a partner in the establishment, or to receive compensation for his services and expenses. Should he choose to become a partner, the agreement provided, that the defendant was to “share and be entitled to claim and receive one equal half part of the profits arising from, or by the business of the said establishment, from its commencement until the same shall be discontinued, he the said Sylvanus E. Benson, bearing and paying one half of the expenses and losses incident to said establishment, and also paying and accounting ,to the said Samuel Hunt and John Patterson for the interest at the rate of six per cent per an-num one on half part of the amount of capital invested by the m in the business of the establishment.”
A stock of goods was furnished by S. Hunt & Co., and Benson came to Nashville where he carried on a prosperous business for the concern. At the end of six months he elected to become a partner, and carried on the business in the name of “Benson, Hunt & Co.” until April, I83S, when it was dissolved by consent. During the continuance of the firm Benson, employed a portion of the profits of the establishment in the purchase of property, consisting of a house and lot in Nashville, turnpike stock, insurance stock, Arkansas land, and several unimproved lots in Nashville, for all of which property he paid out of the funds of the firm upwards of eleven thousand dollars, and took the title in his own name.
The first question is, whether this property is to be regarded as belonging to the partnership, or as the private estate of Benson?
There is no controversy but that where real estate is purchased' for partnership purposes, and on the partnership account, no matter in whose name the purchase is made, and whether the legal title be in one partner or in all, Equity deems it partnership property. *461 2 Story’s Eq. s. 1207: Collyer on Partnership, 68. The circumstance that the payment was made out of the partnership funds, in the absence of countervailing circumstances, will be decisive, that it was intended to be held as partnership property. Hoxie vs. Carr, 1 Sumner’s Rep. 180. But if one partner withdraw funds from the firm find invest them in property in his own name, and for his town private benefit* under such circumstances of consent or knowledge and acquiescence on the part of the co-partners, as to amount to a contract, or loan, the property so purchased would not belong to the partnership, but would be the private property of the person so purchasing. Collyer on Part. 566: Hoxie vs. Carr, 1 Sumner’s Rep. 180: Exparte Harris, 2 Ves. & Beames, 213: Carey on Part. 5 Law Lib. 67: Gow on Part. ch. 2, sec. 1, ch. 5, sec. 2: Exparte Young, 3 Ves. & Beames, 31. On the other hand, although the partner may in fact purchase for his own use, and take the title to himself, yet if it be done under such circumstances that the knowedge and subsequent approbation of the co-pártner cannot be implied, it may be regarded as partnership property, and taken into the account as such. Collyer on Part. 566: Exparte Harris, 2 Ves. and Beames, 214.
In Exparte Harris, (2 Ves and B.) Lord Eldon says: “I lay it down, that if in either the expressed dr implied terms of an agreement for a partnership there is a prohibition of the act, and it is done without the knowledge, consent, privity or subsequent approbation of the other partner, and to the intent to apply partnership funds to private purposes, that is prima facie a fraud upon the partnership.” Nor is the doctrine in Exparte Smith, (1 Glyn & Jameson Rep. 74,) opposed to the principle thus laid down by Lord Eldon.
In that case the vice-chancellor sáid, “If one partner be entrusted with the entire management of the partnership concern, and he withdraw monies for his separate use, which he duly and openly enters upon the partnership books, this is not a fraud, which will entitle the joint estate to prove against the separate; otherwise* if by entries in the books he disguises the transaction, or wholly omits and conceals it.”
Here the making due and open entries in the books of the transaction, is stated to be sufficient to protect it as private property. Evidently this must mean to refer to a case where the co-partner has access to the books, and being enabled by these entries to know what *462 bas beeil done, his consent will be implied, unless he make objection at the time. The closing remarks of the chancellor makes this view of the case quite clear, for he says, “It is otherwise, if by the entries on the books he disguises the transaction, or wholly omits or conceals it.” Thus the omission to enter the transaction on the books, or making entries in such manner as to mislead the co-partner and prevent him, on an examination of the accounts, from acquiring explicit information of the facts, will constitute a fraudi So that this case results in Lord Eldon’s proposition, that if partnership effects be withdrawn and vested in property by one partner for himself, without the “knowledge, consent, privity and subsequent approbation of the other partner, it is prima facie, a fraud upon the partnership, and the property so purchased maybe taken into the account as partnership effects.” But there can be no difference between the omission to make an entry of the transaction in the books, or so disguising it as to mislead, and failing to disclose the facts fully and distinctly to partners who reside at a great distance, and cannot possibly see the books. Of what value, is a full and open entry in the books, to a partner residing a thousand miles from the place they are kept, and who, in the nature of things, cannot inspect them? How would it tend to impart to him that knowledge, from which his assent or approbation might be inferred, and without which the party withdrawing the fund cannot acquire a separate title to the property purchased? All the casess therefore, to which the defendant’s counsel has referred, are to be understood upon a fair interpretation of them, as supporting the propositions above laid down. By the terms of this partnership, S. Hunt & Co. were to furnish the capital, and Benson was to conduct the establishment, and be entitled to receive half the profits of the business from its commencement until its termination, paying one half the expenses and losses, and interest upon one half the capital so furnished.
Now as Benson was to be entitled to one half of the profits, and be subject to half the losses and expenses from the commencement of the business until it should be discontinued, he could not, without the consent of his co-partners, withdraw any of the funds from the concern for private purposes, except to defray his necessary personal expenses.
In sueh a partnership as this, one partner cannot acquire an exclusive right to any part of the stock, until the partnership is set- *463 tied and its debts are paid. Then he is entitled to his share of the surplus. 3 Kent Com. 36-37, and authorities there cited. For until the debts are paid, and the partnership is settled, each partner has an implied lien on the partnership property, as his indemnity against the joint debts, and his security for the ultimate balance due him. 2 Story’s Eq. sec. 1243. But if one partner without the knowledge or consent of his co-partners, may withdraw at pleasure what he may suppose will amount. to his part of the profits, he may defeat his co-partner’s lien, and leave him to pay the joint debts and get his portion of the surplus, as best he may, out of the remaining effects of the firm. This cannot oe done; and therefore, unless Mr. Benson had the express or implied consent of his partners, to vest the joint funds in property for his private use and benefit, he cannot be permitted to withold it from the account.
This leads us into an investigation of the facts in relation to this part of the case: 1st. As to the house and lot in Nashville, for which Benson gave $3810. He says in his cross bill, that although this property was purchased with the joint funds, yet it was purchased for his private use, for a dwelling house; that open and fair entries were made upon the books, by which he charged himself with the money paid for this property; that he sent a balance sheet showing the state of the business to complainants, and that he wrote them a letter in which he fully disclosed the facts.
The answer admits the purchase, and the entries on the books as stated, and also admits that a letter was received from the defendant in which he stated that he had purchased a house, but it denies that the letter gave full and distinct information of the facts in relation to the purchase, but on the contrary, that complainants supposed the house had been purchased on the partnership account for the purpose of carrying on the business of the establishment; that said letter is lost and cannot be produced.
Golladay’s deposition proves, that when Hunt was about filing this bill, he told witness that he received a letter from Benson, informing him of the purchase of the house. Judge Catron states in his deposition, that the parties conversed with him before the bill was filed; that Hunt said the house had been purchased without the knowledge of himself or Patterson, but that he afterwards heard of the purchase; that he did not assent or dissent until he came to Nashville, when he discovered the partnership notes had been given to secure the payment of the purchase money for the house, and *464 that the partnership money had been paid in taking up these notes, and that the law arising on these facts made it partnership property, he then claimed the profits on the' re-sale as profits of the partnership.
Upon these facts, we do not think the partners of Mr. Benson at Baltimore had that knowledge, either express or implied, of this transaction, from which we have a right to infer their subsequent approbation ofhis acts.
It has been already intimated that the entries on the books of the firm at Nashville, however explicit and open, could give the partners at Baltimore no information, and that what is said in cases cited in argument about the sufficiency of such entries, applies only to cases where the co-partners are in a situation to ascertain the truth of the facts by means of these entries. But it is argued, that information was communicated by means of the balance sheet that was sent to the complainants. This is altogether a mistake, as the balance sheet only exhibits the gross amount due from each person, and does not specify the items of account. If it were to show the items, instead of being a balance sheet, it would be a copy of the books. Although, therefore, the balance sheet would show that Benson was debtor to the firm upwards of three thousand dollars, it would not show how that indebtedness was created. As to the admission of the answer, and Hunt’s admission to Golladay and to Judge Catron, there is nothing to authorise the belief that the partners at Baltimore knew 'that Benson had. purchased this house with partnership means for his own private use. His letter that he had bought the house, without stating how hé had paid for it, and that he intended it for his own use and not for the concern, would fall under the principle laid down by the vice-chancellor in Exparte Smith, (1 Glyn and Jameson’s Rep. 74,) of “disguising the transaction.” The fact might be, that he had bought it and paid for it from privatefunds, or that he had bought it for the concern. In either case they need make no objection. The depositions of Golladay and Catron prove no more than the admissions of the answer, and we think fall far short of proving the existence of that knowledge on the part of S. Hunt & Co. at Baltimore that would amount to a “contract or loan” of these funds to Benson, or a “subsequent approbation” of his act.
As to the Arkansas lands, the only information which was given was communicated in a letter to Patterson, in which Benson tells *465 him he had invested a few thousand dollars in lands in that country. It does not communicate the knowledge, that these few thousands were funds of the concern, nor does the letter state that the purchase was made for his own benefit. Subsequently, the defendant was at Baltimore, and mentioned something about his purchase of Arkansas lands to Hunt, who, without waiting to listen to the statement, abruptly told the defendant to go home and pay his debts and let Arkansas lands alone. Hunt evidently intended to discourage these speculations, and if he acquired any knowledge of the purchase, his manner would indicate that he thought these speculations had been made in behalf of the firm, and he did not wish its affairs involved in such a business.
In Hunt’s conversation with Judge Catron, he seemed to regard these lands as of but little value, supposing that as good land could yet be obtained there at the same price. There is nothing in this conversation by which he admits that he had received such knowledge as would bind him, or by which he relinquishes any right to these lands.
As to the other sums laid out in property, there is no evidence that any information of any kind was ever communicated to the complainants. Upon the whole view of this part of the case, we are of opinion that all the property which was purchased by Benson with partnership monies, shall be taken into the account as partnership effects. If any of- the real estate has been sold for a profit, the partners are entitled to share in profit.
We do not mean to say that Benson intended any thing wrong in these transactions; on the contrary, all the facts together satisfy us, that he supposed he was entitled to make the appropriation of the profits of the business in the way he did. But this private opinion on his part, does not change the view, that a court of equity takes of the transaction.
2. In calculating the interest upon the capital, the stock of goods laid in and sent to Nashville, when the establishment was first put in operation here, will be taken as capital, and interest will be calculated upon the one half of that amount up to the time of taking the account, and the amount will be charged to Benson and credited to the complainants. _
The balance of the goods furnished the establishment here by S. Hunt & Co. will be regarded as purchases by the firm of Benson, Hunt & Co. from the firm of S. Hunt & Co. Interest will be char *466 ged upon these goods as follows, namely: Upon all bills purchased from other houses than S. Hunt & Co. for the firm of Benson, Hunt & Co., interest will be charged from the time said purchases became due, according to the terms of the contract, up to the time of taking the account.
As to goods furnished by S. Hunt Co. in pieces, out of their own stores, interest will be charged from six months after the goods left Baltimore. Upon ready-made clothing, interest will be charged from the time the goods left Baltimore to the taking of the account. The house of Benson, Hunt & Co. will be credited with interest on all remittances to the House of S. Hunt & Co. from the time the payments were made until the taking the account.
When the whole account is settled and the debts are paid, S. Hunt & Co. will be entitled to the amount of their capital, (the value of the stock of goods first furnished,) and the surplus will be equally divided, and from Benson’s share of such surplus will be subtracted the amount of the interest on one half said capital, which sum will be added to S. Hunt & Co.’s share.
So S. Hunt & Co. will have their capital originally furnished, and half the clear profits of the business, plus the interest on the half of said capital, and Benson will have half the clear profits, minus the interest on half the capital.